IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO. 9-53118 |
| GARY J. KATLEMAN, | § | Chapter 11 Proceeding lmc |
| Debtor. | § | |
| | § | |

**MOTION OF E.F. VILLAGE FUNDING, LP TO APPOINT A CHAPTER 11 TRUSTEE PURSUANT TO UU U.S.C. SECTION 1104 OF THE BANKRUPTCY CODE OR, IN THE ALTERNATIVE, TO CONVERT CASE TO CHAPTER 7 OR DISMISS PURSUANT TO 11 U.S.C. SECTION 1112(b)**

**NO HEARING WILL BE CONDUCTED HEREON UNLESS A WRITTEN REQUEST FOR HEARING IS FILED WITH THE CLERK OF THE UNITED STATES BANKRUPTCY COURT WITHIN TWENTY-ONE (21) DAYS FROM THE DATE HEREOF UNLESS THE COURT, UPON TIMELY APPLICATION, SHORTENS OR EXTENDS THE TIME FOR FILING SUCH REQUEST FOR HEARING. IF NO HEARING IS TIMELY REQUESTED HEREON, THE MOTION WILL BE DEEMED UNOPPOSED, AND THE COURT MAY ENTER THE ORDER GRANTING RELIEF.**

E.F. VILLAGE FUNDING, LP ("EFVF"), by and through counsel, file its Motion to Appoint a Chapter 11 Trustee Pursuant to 11 USC Section 1104 and, alternatively, to Convert to Chapter 7 or Dismissal and, in support thereof, respectfully submits as follows:

A. BACKGROUND

1.      GARY J. KATLEMAN ("Katleman" or "debtor"), Debtor, originally filed a Chapter 11 voluntary petition on August 17, 2009.   Katleman currently serves as debtor in possession and this case has not been previously converted from another Chapter of Title 11.

2.      EFVF is the largest unsecured creditor in this bankruptcy proceeding with an unsecured claim of not less than $8.4 million.

## B. JURISDICTION

3.    This court has jurisdiction pursuant to 28 U.S.C. Sections 57 and 1334 and venue is proper.

## C. FACTS

4.    On February 16, 2004, Golden Visions, Inc., Gary Katleman, Joel Katleman, and Joel Pollack (the "Existing Partners") entered into the Limited Partnership Agreement of Dominion Village, Ltd. ("Partnership") to develop Independence Village at the Dominion, an approximately 190-home retirement community.  After formation of the Partnership, EFVF loaned the Partnership Two Million Five Hundred Thousand 00/100 Dollars ($2.5 million) secured by a second lien on the property.

5.    Shortly thereafter, the Existing Partners realized that they had insufficient capital to develop the project and approached EFVF about converting the existing loan into an equity position and infusing additional capital.   In connection with this, Dominion Village and the partners provided certain financial information upon which EFVF detrimentally relied. On January 1, 2006, pursuant to the First Amendment to Limited Partnership Agreement effective (the "First Amendment"), EFVF's loan was converted into the "Initial EF Funding Capital Contribution," EFVF became a limited partner of the Partnership, and agreed to contribute up to an additional Six Million 00/100 Dollars ($6,000,000.00) in capital contributions to the Partnership.

6.    EFVF subsequently funded an additional $5.9 million dollars in capital contribution to the Partnership.   EFVF's $5.9 million dollar additional

capital contribution and the $2.5 million dollar Initial EF Funding Capital Contribution aggregately constitute the "EF Funding Preferred Contribution" to the Partnership. Thus, EFVF contributed $8.4 million as the EF Funding Preferred Contribution to the Partnership. Section 19 of the First Amendment reflects the Partnership's agreement to make payments to EFVF to reduce the unreturned EF Funding Preferred Contribution ("Reduction Payments"). The Reduction Payments were scheduled by payment date and payment amount in Section 19 of the First Amendment. Based on the financials provided on both the entity and the Existing Partners, EFVF made the investment with the express understanding that, in the event of a default – including the failure of the Partnership to pay the Preferred Return in the amount due on schedule, the Existing Partners would repurchase the EFVF's interests in the Partnership. Despite its promise, the Partnership failed to make the December 31, 2008 Reduction Payment to EFVF, which triggered the Existing Partners' obligation to repurchase EFVF's interest in the Partnership, which the Existing Partners (both Debtors in bankruptcy and Joel Pollack) failed and refused to do.

7.    Long before the Reduction Payment default, however, Dominion Village and the Existing Partners advised EFVF that the project was in financial difficulty. Specifically, at the end of April 2008, EFVF was notified by the one or more of the Existing Partners that there had been no sales for the previous three months and the project was unable to meet its cash needs; consequently, the project needs to be sold or some land sold or new investors come into the deal. Contemporaneously with this revelation in early May 2008, Joel Pollack advised

that Dominion Village was entertaining the sale of some or the entire project to a Mexican investor group represented by Carlos Rodriquez. On or about May 18, 2008, EFVF was notified that the Mexican investor group has decided to pass on the deal. From May 2008 forward, Dominion Village has been plagued by its poor performance and lack of cash flow. These dates are important as they relate to the timing of certain prepetition conduct by the Debtor and his father.

8.     On or about September 23, 2008, Dominion Village represented to EFVF that the original business plan was no longer feasible and looked to EFVF to provide an additional $1.3M in a debt service and operating reserve to ensure the projects sustainability for the next twelve (12) months. EFVF declined to make a further capital infusion. Subsequently, on September 30, 2008, Dominion Village acknowledged that there was insufficient cash to fund the EFVF preferred return and proposed an adjustment to the capital accounts to reflect this transaction to which EFVF denied consent. Dominion Village defaulted with respect to the EFVF preferred return and then, in December 2008, failed to make the Reduction Payment.

9.     On January 14, 2009, EFVF provided its "Notice of Default" letter stating that the Partnership failed to make the December 31, 2008 Reduction Payment, required to reduce the EF Funding Preferred Contribution to $7,365,158. Moreover, the January 14 letter also provided notice that if this default was not cured within ten days, then EFVF would exercise its right to cause the Existing Partners to acquire EFVF's partnership interest. The Existing Partners failed to cure the default.

10. On January 28, 2009, EFVF provided its "Exercise of Right to Require Existing Partners to acquire all of the Partnership Interest of EFVF" letter. This letter referenced EFVF's prior notice of the default. EFVF sent this letter because the default was not cured. Accordingly, EFVF made its written demand for the Existing Partners to acquire all of its partnership interest. Despite the proper demand, the Existing Partners failed to acquire EFVF's partnership interest. The Existing Partners' breach resulted in damages in the amount of $8.4 million (*viz.* the unreturned balance of the EFVF Preferred Contribution).

11. On February 24, 2009, EFVF again provided the Existing Partners one final opportunity to resolve the dispute concerning the reacquisition of the EFVF limited partnership shares or suit would be initiated, a copy of the proposed petition was attached thereto. The letter envisioned a definitive settlement by March 20, 2009 with closing no later than March 31, 2009. No agreement was reached.

12. On March 27, 2009, EFVF filed suit in Bexar County District Court, Cause No. 2009-CI-05190, against, Katleman, co-debtor Joel M. Katleman, Joel Pollack, and Golden Visions, Inc., for breach of the partnership agreement (1st Amended Partnership Agreement).

13. On July 16, 2009, EFVF filed its Motion for Summary Judgment and a hearing was set for August 17, 2009. No response to the motion for summary judgment was filed by any of the defendants, including the Debtor.[1] At the summary judgment hearing on August 17, 2009, counsel for the defendants

---

[1] At the 341 meeting, co-debtor's counsel, Mr. Ayers, further stipulated that no response to the summary judgment had been filed on behalf of the debtor.

advised that Gary Katleman had filed for bankruptcy protection that morning. Before an order was entered, counsel for the defendants advised that co-debtor, Joel Katleman, had also filed for bankruptcy protection. Subsequently, an agreed judgment was entered against the two non-bankrupt co-debtors, Pollack and Golden Visions, Inc.

## D. THE COURT SHOULD APPOINT A CHAPTER 11 TRUSTEE

14.    Once a debtor enters Chapter 11 and becomes a debtor in possession,[2] the debtor, as a "debtor in possession" is endowed with the powers, duties and *fiduciary responsibilities* of a trustee in bankruptcy. *See* 11 U.S.C. § 1107 (1988) (conferring upon the debtor in possession the power of a bankruptcy trustee). Section 1107(a) of Title 11, United States Code (the "Bankruptcy Code") provides the debtor with the opportunity to run its business and manage its affairs as a debtor in possession free from the requirement of an independent trustee appointment. *Id.* § 1107(a).

15.    The privilege and opportunity afforded the debtor and its management to continue to operate its business as a debtor in possession free from all "'self help" rights of creditors will be withdrawn by the Bankruptcy Court if the debtor is unable or refuses to abide by the provisions of the Bankruptcy Code established to protect the interests of all creditors.[3] The Bankruptcy Code

---

[2]  It is important to note that a "debtor" is not required to be a "debtor-in-possession" but must elect to serve in that capacity by not requesting a Trustee be appointed over the estate. A debtor has a right to require the appointment of a Trustee over the debtor's estate. A debtor that elects to be a "debtor-in-possession" must assume the fiduciary responsibilities of a Trustee.

[3]      It is clear that Debtors <u>must</u> comply with the Bankruptcy Rules of Procedure or risk the consequences. *See, e.g., In re Gaff, Inc.,* No. 3-83-254 (Bankr. D. Minn. March 6, 1984) (debtor consistently failed to comply with Code's reporting provisions); *In re Ford,* 36 Bankr. 501, 503-04

provides the specific mechanism for such withdrawal in Section 1104(a) of the

Bankruptcy Code which provides in pertinent part:

> "At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest, and after notice and a hearing, the court shall order the appointment of a trustee--
> (1) *for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause*, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor;
> (2) if such appointment is in the interest of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor." 11 U.S.C. s 1104(a) (1982); or
> (3) if grounds exist to convert or dismiss the case under section 1112, but the court determines that the appointment of a trustee or examiner is in the best interests of the creditors and the estate.

A trustee is appointed only at the request of a party in interest and "after notice

and a hearing." 11 U.S.C. § 1104(a) (1982). [4] In other words, the Code provides

two justifications for appointment of a trustee. The first is an appointment for

---

(Bankr. W.D. Ky. 1983) (failure to file accurate financial statements, thereby covering up postpetition transfers of assets); *In re Vischschoonmaker, Ossendryver Galleries Int'l, Inc.*, 35 Bankr. 816, 820 (Bankr. D. Hawaii 1983) (failure to provide accounting to court); *Westinghouse Credit Corp. v. Prime, Inc., (In re Prime, Inc.)*, 26 Bankr. 556, 560 (Bankr. W.D. Mo. 1983) (in view of debtor's repeated failure to observe letter and spirit of court's orders, trustee appointed to supervise debtor, and to file reports required by local rules); *In re Horn & Hardart Baking Co.*, 22 Bankr. 668, 670-71 (Bankr. E.D. Pa. 1982) (sporadic filing of monthly statements combined with continuing, unexplained losses amounted to mismanagement); *In re Caroline Desert Disco, Inc.*, 5 Bankr. 536, 537 (Bankr. C.D. Cal. 1980) (debtor's failure to comply with local rules governing controls of disbursements, reports concerning operation of business, insurance and reports to United States Trustee constituted incompetence or gross mismanagement). *See generally In re Modern Office Supply, Inc.*, 28 Bankr. 943, 944 (Bankr. W.D. Okla. 1983) (discussing the reporting duties of a debtor in possession); *In re Sea Queen Kontaratos Lines, Ltd.*, 10 Bankr. 609, 610 (Bankr. D. Me. 1981) (suggesting, in dictum, that a local rule violation is per se gross mismanagement).

[4] The phrase 'after notice and a hearing' is defined in section 102(1)(A) to mean 'after such notice as is appropriate in the particular circumstances, and such opportunity for a hearing as is appropriate in the particular circumstances . . ..' 11 U.S.C. s 102(1)(A) (1982).

cause, applying specific enumerated grounds, whereas, the second is less objective and applies a weighing of competing interests to determine the best interests of the estate and creditors.

**FOR CAUSE**

16.     The grounds listed in section 1104(a)(1) are not exclusive.   The rules of construction of the Bankruptcy Code make it clear that the words "includes" and "including" are not limiting. *See* 11 U.S.C. § 102(3) (1982). Courts reject any attempts to limit the "for cause" analysis under section 1104(a)(1) to cause "in the nature of fraud, dishonesty, incompetence or gross mismanagement." *See, e.g., In re Casco Bay Lines, Inc.*, 17 Bankr. 946, 950 n.4 (Bankr. 1st Cir. 1982). *See also In re Ford, 36 Bankr.* 501, 504 (Bankr. W.D. Ky. 1983); *In re Martin*, 26 Bankr. 39, 40 (Bankr. S.D.W. Va. 1982).   And the authorities are in agreement that the time frame for the court's review of current management's actions embraces conduct both *before and after* the commencement of the case. *See, e.g., In re Anniston Food-Rite, Inc.*, 20 Bankr. 511, 515 (Bankr. N.D. Ala. 1982); *In re Curlew Valley Assocs.*, 14 Bankr. 506, 515 (Bankr. D. Utah 1981); *Dardarian v. La Sherene, Inc. (In re La Sherene, Inc.)*, 3 Bankr. 169, 175 (Bankr. N.D. Ga. 1980); *see also In re Main Line Motors, Inc.*, 9 Bankr. 782, 784-85 (Bankr. E.D. Pa. 1981) ('The fact that the events preceded the bankruptcy petition is not controlling because section 1104(a)(1) embraces activities 'either before or after the commencement of the case).

17.     In fact, when flagrant violations occur, the appointment of a trustee may be mandatory. *See In re Deena Packaging Indus., Inc.*, 29 B.R. 705, 706

(Bankr. S.D.N.Y. 1983) (noting that case law interpreting § 1104(a)(1) has found where cause exists, there is no discretion and a trustee must be appointed). When a debtor flagrantly violates court orders and debtor-creditor agreements, the Court's recognize that there are few alternatives except to remove the debtor in possession. *See In re Aerosmith Denton Corp.*, 36 B.R. 116, 119 (Bankr. N.D. Tex 1983) (code's failure to specify sanctions does not mean a debtor's misuse of cash collateral should go unpunished).

18.    Contemporaneously with the filing of this motion, Movant is also seeking the appointment of a trustee in the parallel proceeding, Joel Katleman Case No. 09-53125. Debtor has played a continuous and systematic role in many of the suspect transactions; Consequently, Movant believes that the appointment of a trustee is warranted under either the "for cause" or "best interest" standard as follows:

### *Failure to Disclose-Fraud and Dishonesty*

18.    The debtor in possession has a duty to fully and completely disclose his transactions and the circumstances that lead to the bankruptcy filing. In this matter, Debtor has failed and continues to fail to provide truthful and accurate financial information from which his financial affairs can be determined.

19.    On information and belief, Debtor failed to make the following disclosures and/ or provided false and misleading information regarding certain alleged gambling transaction in the nine months prior to filing for bankruptcy protection.

20.     Specifically, at the same time as EFVF was filing suit[5] and in lieu of making any payments to EFVF and Falcon, Debtor elected to channel @$550,000.00[6] to various Las Vegas casinos.  It has been difficult to reconstruct Debtor's alleged gambling transactions but utilizing the records produced by the casino's and Debtor's bank, identify the following transactions:

    a) 2/18/09
        i) Bellagio wire transfer $250,000
        ii) Caesars' wire transfer $50,000
    b) 2/19/09 –Bellagio wire transfer $100,000
        ii) Caesars cash check $15,000
    c) 2/20/09 – Caesars $15,000
    c)  2/21/09 – Bellagio wire transfer $50,000
    d) 2/23/09 – Caesars credit back wire transfer $150,000
    d) 3/11/09 – Caesars' $50,000
    f) 3/20/09-
        i)Venetian/Sands cash deposit $50,000
        ii) Wynn $50,000
    g) 6/12/09  - Caesars $230,000[7]
    h)  7/13/09 – Caesars  $22,500
    i) 7/25/09 – Bellagio $5,000 NSF check
    j) 7/29/09 – Casesars check $21,800
    j) 7/30/09 – Bellagio $30,000 check
    k) 8/14/09 – Bellagio wire transfer $30,000
    l)  8/14/09 – Caesars credit back by wire $30,000
    m) 8/17/09 – Bellagio credit back $30,000

_____postpetition_____

    n) 1/08/10 – Caesars  amount unknown, used comp

[checks and wire transfers identified totaled @$759,000 less credits for an amount in the range of $529-567,000]

_____

[5] EFVF subpoenaed the records from @ 20 casinos, some of which resulted in information on the Katlemans and some not.  The transactions referenced above occurred primarily at the Bellagio and Caesars between 3/17-27/09.   At the same time as these transfers were being made by debtor, his father Joel Katleman, moved another @$350,000 into the Vegas casinos.
[6] SOFA Item 8,  debtor references $567,000 in "gambling losses."
[7] Amount moved into safekeeping at Caesars.  On, June 13, 29009, $50,000 Caesars chips cashed at Rio by debtor and $35,000 by his father.

25.     What happened to these funds is the paramount question. According to the casino records, Debtor had no prior history of significant gambling activity or of being a "high stakes" player. The available casino records reflect nominal betting and no significant losses, all recorded losses being in the $500-2,000 range.    Because of the amount of money being transferred and the size of the bets being placed, one casino was suspicious of Debtor's activity because he was not playing at a level commensurate with the size of the funds on hand.  There was also one instance where Debtor and his father converted chips from one casino (Caesars') into cash or chips at another (Rio) and another where funds were converted into Canadian dollars.  Debtor's explanation is that he was a high stakes poker player and the money was lost playing poker.  An alternate and, under the circumstances, more plausible explanation is that Debtor never lost the money and the funds remain in cash or chips. Then    net    effect being that Debtor and his father, co-debtor Joel Katleman (case No. 09-53125) moved almost $1 million dollars outside the reach of their creditors within the nine months prior to filing for bankruptcy protection.

### *Fraudulent Transfer Participation*

21.     At the 341 meeting Debtor's father and co-debtor, Joel M. Katleman, testified that as part of an eleven-year estate plan, he had established a mechanism to minimize his estate taxes.   Contrary to Joel Katleman's representations, however, there was no eleven-year estate plan but, instead, an ill-timed blatant attempt to put his assets beyond the reach of his creditors in late May 2008. The timing of these transactions is important because the "estate

planning" is contemporaneous with the Existing Partners' (including Debtor) acknowledgement of the financial straits affecting Dominion Village and its inability to meet debt payments which, upon default, would result in the Existing Partners, including the Debtor, being called upon to buy back the interests of EFVF.

22.     Joel Katleman's estate plan consisted of the sale of substantially all of his assets to a self-settled irrevocable trust in exchange for a self-cancelling note, secured by the transferred partnership interests, in the amount of $6.5 million.[8]  Joel Katleman next created a family limited partnership and assigned the note and security interest to the limited partnership.  Joel Katleman is sole owner of the partnership.

23.     Gary Katleman serves as the Trustee of the Joel M. Katleman Irrevocable Trust, as the President of Joel Katleman Family General, LLC, general partner of the Joel Katleman Family Limited Partnership.  All of these entities were created on or about May 27, 2008.  Joel Katleman is the secretary of the Joel Katleman Family General LLC.  As a result of these roles, Debtor is inextricably interwoven into all of the transactions related to the trust and family limited partnership.  Debtor is integrally involved in the operations, including serving both as the disbursing agent and signatory for all transactions out of the trust and as manager of the family partnership.

24.     Further, there are multiple irregularities with respect to the note and security agreement as well as a failure to adhere to the "corporate" formalities of

---

[8] In contrast, Debtor's March 25, 2009 financial statement valued this note at only $1.5million.

the structure of the estate plan.[9] Similarly, the only disclosed payment from the trust bypassed the family limited partnership and directly into Joel Katleman's personal account. All of these documents were executed by Debtor in one or more of his various capacities.

23.    Debtor cooperated with and facilitated his father's illegitimate pre-bankruptcy "estate plan" in an attempt to defraud and/or place his assets beyond the reach of their creditors, which assets should be recovered and brought back into Joel Katleman's estate.[10] Under either Section 548 of the Code or Section 24.000 of the Texas Fraudulent Conveyance Act, Joel Katleman's alleged "estate plan" as well as several other transfers should be set aside as a fraudulent conveyance for the benefit of the estate and his creditors.

***Gross Mismanagement and Incompetence***

---

[9] On May 27, 2008, Debtor, as trustee and on behalf of the trust, purchased the subject limited partnership interests in exchange for a note, executed by debtor, as trustee, in the amount of $6.5M payable to Joel Katleman and Marilyn Soper along with a security agreement. Under the terms of this note, 50% of the debt was to be cancelled upon the death of Joel Katleman. On the same date, Joel Katleman transferred the note and lien to his newly created family limited partnership. Subsequently, on September 28, 2008, debtor executed a First Modification of the Note, changing the payee to Joel Katleman, individually, and increasing in the self-cancellation provision from 50% to 75% upon the death of the payee. The notes provided for annual installment payments of $650,000 commencing six (6) months after the effective date; but, to date, no installment payments have been made. In or about November 2008, the one and only payment from the trust was made payable directly to Joel Katleman the sum of $250,00, reflecting an alleged interest payment. The note is in default.

[10] Section 548 of the code has two provisions that affect avoidance actions, 548a)1) provides that a transaction may be set aside if made within two years from the date of filing while 548e)1) provides for a ten-year (10) look back when the transfer is to a self-settled trust. Under 548 a) 1)A) a transfer may be set aside if it was made with actual intent to hinder, delay or defraud whereas under 548a)1)B) not showing of intent is required only a showing of less than reasonably equivalent value and insolvency. Section 548e)1) additionally provides that a transfer may be set aside if the debtor made the transfer to a self-settled trust, the debtor is a beneficiary of the trust, and the transfer was made with intent to hinder, delay or defraud a creditor which the debtor was or became indebted. Similarly, under Texas law, Section 24.000 et seq. of the Tex. Bus. & Com. Code aka Texas Fraudulent Conveyance Act, there is a four-year timeframe to set aside transfers under traditional fraudulent conveyance concepts.

26.     At the time EFVF was induced to lend money and become a limited partner in Dominion Village, the Existing Partners represented that the total cost of Phase I construction, including the entire project land cost and 50 unit build out, would be in the neighborhood of $23 million.  To date, there are only 34 units constructed, the clubhouse remains unfinished, the actual construction costs for this phase of the project exceed the budget by almost $10 million.[11]

27.     The project has been on a precarious financial footing since early 2008 and is not getting better.  There have been no sales in the past year, cash flow from the project is insufficient to meet the ongoing operating expenses as well as debt service, membership funds were not escrowed and have been expended leaving a $5.4 million dollar contingent liability, there are no funds to complete the project, and Debtor has again sought approval from the bankruptcy court to fund the next quarterly interest payment to the secured lender.  Movant has objected to this action and the matter is set for hearing.  Movant submits three is no reasonable likelihood of any recovery and foreclosure may be imminent.

28.     During the financial meltdown of Dominion Village, the Existing Partners refused and continued to refuse to keep EFVF reasonably informed of its deteriorating financial condition.  Moreover, when the Existing Partners had an opportunity to make a cash infusion to help salvage the project and apply the funds to debt service of Falcon and EFV, two of the three partners elected to allegedly "gamble" away $900,000.00 in Vegas.  Both of these partners were

---

[11] SDD, a wholly owned entity of the Existing Partners was the construction company on this project and the total debt against the project exceeds #32 million.

personally liable to EFVF through the First Amended Limited Partnership Agreement. It is axiomatic that almost every Chapter 11 case has some degree of mismanagement and disregard of corporate formalities; however, this project was not simply the victim of poor management but, instead, suffers from poor decision-making at the outset coupled with unexplained budget overruns and an ongoing failure to stop operational losses after filing.

29.     Debtor and his co-debtor father, Joel Katleman, own and operate multiple limited partnerships, corporations, trusts and other entities. All of these entities are interlocking in nature and it appears that the Katleman's have the ability to withdraw and/or divert funds from one operation to another or themselves with little or no accountability.     These entities are inextricably intertwined with one another that, on information and belief, have resulted in alleged intercompany loans, the commingling of funds as well as the use of entity funds for personal use. Given Debtor's pre- and postpetition conduct, Movant submits that Debtor lacks the managerial and organizational credibility to reorganize.

### Conflict of Interest

32.     As a debtor in possession in Chapter 11, all of the avoidance powers of a trustee reside in the debtor. There are inherent and irreconcilable conflicts of interest in this case that preclude this Debtor from impartially investigating and recovering certain avoidance actions for the benefit of the estate. Debtor has been requested to set aside these transactions, including facilitating the unwinding Joel Katleman's alleged "estate plan;" however, Debtor

has failed to initiate any such actions. Under these circumstances, appointment of trustee would significantly benefit the estate. See, *In re L. S. Good & Co.,* 8 Bankr. 312, 315 (Bankr. N.D.W. Va. 1980).

**BEST INTERESTS OF ESTATE AND CREDITORS**

33.     The second justification for the appointment of a Trustee is if such appointment is in the best interests of the estate and creditors.     There is little guidance from the language of the statute or its legislative history; however, the current consensus of opinion is that the court is called upon to weigh the interests of all of the relevant constituencies in the case, not just the creditors. In this case, however, there are really no constituencies other than EFVF as it comprises almost 100% of the debt and there are no equity holders.

34.     In weighing the interests, courts have considered factors such as the trustworthiness of the debtor, its past and present performance and prospect for rehabilitation, and the confidence of the creditors in current management. As demonstrated in the "for cause" section, there are serious concerns both about Debtor's trustworthiness a well as his prospects for rehabilitation.     Given his failure to take any action to date, it is apparent that Debtor's inherent conflict of interest is interfering with his fiduciary duty to the estate and has precluded him from setting aside the multiple pre-and postpetition transfers.     Under these circumstances, there has been a wholesale failure to instill confidence in the debtor's abilities and appointment of a trustee would be in the best interests of estate and creditors.

*Conclusion*

35.     Based on the foregoing, EFVF submits that appointment of a

Trustee is warranted under either the "good cause" or "best interests" tests.

<u>E. IN THE ALTERNATIVE, THE COURT SHOULD CONVERT
THIS CASE TO CHAPTER 7 OR DISMISS</u>

36.     A party in interest may file a motion to dismiss or convert a Chapter

11 case to a Chapter 7 case for cause.  Section 1112(b)(1) of the Bankruptcy Code

states that:

> "Except as provided in paragraph (2) of this subsection, subsection
> (c) of this section and section 1104 (a)(3), on request of a party in
> interest, and after notice and a hearing, absent unusual
> circumstances specifically identified by the court that establish that
> the requested conversion or dismissal is not in the best interests of
> creditors and the estate, the court shall convert a case under this
> chapter to a case under chapter 7 or dismiss a case under this
> chapter, whichever is in the best interests of creditors and the estate,
> if the movant establishes *cause*."

Once cause for such relief is shown, the court has broad discretion to either

convert or dismiss the Chapter 11 case.[12]

37.     Although the list is not all-inclusive,[13] Code § 1112(b)(4) provides that

"cause" includes 16 grounds for conversion or dismissal including the following

factors applicable in this case:

---

[12] 11 U.S.C.A. § 1112(b)(1) ("whichever is in the best interests of creditors and the estate"). See,
e.g., *In re Klenosky,* 130 B.R. 132 (E.D. N.Y. 1991) (court has power to convert Chapter 11 case
when party in interest has only moved to dismiss); *In re Express Freight Lines, Inc.,* 119 B.R.
1006 (Bankr. E.D. Wis. 1990) (where there are substantial assets that may be consumed unless
trustee is appointed, conversion, rather than dismissal, is appropriate).
[13] See 11 U.S.C.A. § 102(3).

a) substantial or continuing loss or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;

b) gross mismanagement of the estate;

d) unauthorized use of cash collateral substantially harmful to 1 or more creditors;

e) unexcused failure to satisfy timely any filing or reporting requirements established by this title or by any rule applicable to a case under this chapter.

38. The reasoning and evidence submitted in connection with the appointment of a Trustee also support conversion of his case to chapter 7 and/or dismissal.

39. Movant further submits that Debtor has no reasonable likelihood of rehabilitation and no ability to confirm a plan. Movant reserves the right to amend or supplement this motion depending on the outcome of scheduled hearings regarding further funding of the Falcon debt and filing of a Chapter 11 plan on March 31, 2010.

40. Furthermore, in a conversion, an independent trustee would pursue preference claims and fraudulent transfers that Debtor's conflicted interests would keep him from pursuing. Pursuing such actions would be in the best interests of creditors and the estate and should be taken into account when deciding on this motion pursuant to § 1112(b) and 1104(a).

41. The court has broad discretion to either dismiss or convert a Chapter 11 case and may consider other grounds as they arise after notice and hearing, Section 1112(b) mandates that the and may use its equitable powers to reach an appropriate result. Once "cause" is established, however, court must convert or

dismiss the case (whichever is in the best interests of creditors and the estate) unless it specifically finds and enumerates that the requested conversion or dismissal is not in the best interest of creditors and the estate. 11 U.S.C. § 1112(b)(1).

43.    Movant submits that in the event the court declines to appoint a Chapter 11 trustee, the evidence before the court supports dismissal or conversion. Section 1104(a)(1) states that the court shall order the appointment of a case trustee "for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the Debtor by current management, either *before or after* the commencement of the case…" Section 1104(a)(2) states provides that the court shall appoint a trustee if such appointment "is in the interests of creditors, any equity security holders, and other interests of the estate … ." Requisite "cause" has been shown to appointment a trustee because of the gross mismanagement, non-disclosures, and the need of an independent trustee to pursue avoidance actions that would benefit the estate and be in the best interests of the estate and creditors. Alternatively, Movant submits that conversion or dismissal of the case would be similarly justified and appropriate.

## F. RELIEF

For the foregoing reasons, Movant respectfully requests that this Court appoint a Chapter 11 trustee or, alternatively, convert this to a case under Chapter 7 of the Bankruptcy Code pursuant to Section 1112(b) of the Bankruptcy Code or dismiss the case.

Respectfully submitted this 24th day of March 2010.

(s) Thomas W. McKenzie
THOMAS McKENZIE
State Bar No. 13708700
Law Offices of
Thomas W. McKenzie
10107 McAllister Freeway
San Antonio, Texas 78216
(210) 227-2698
(210) 227-9334 – FAX


and

Derick J. Rodgers
Davis, Cedillo & Mendoza, Inc.
McCombs Plaza, Suite 500
755 E. Mulberry
San Antonio, TX 78212
210.822.6666
210.822.1151
Email: drodgers@lawdcm.com

ATTORNEYS FOR EF VILLAGE
FUNDING LP

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing *Motion to Appoint Chapter 11 Trustee– Debtor, Gary J. Katleman* in accordance with the courts ECF policy and to any non-subscribers to ECF by mailing same, U.S. First Class Mail on the 24th day of March 2010

William B. Kingman
4040 Broadway
San Antonio, TX 78209

R. Glen Ayers
Langley & Banack, Inc.
Trinity Plaza II
745 E, Mulberry, Suite 900
San Antonio, TX 78212

Richard E. Haynes
Trevino, Valls & Haynes LLP
6909 Springfield Ave., Suite 200
Laredo, TX  78041

U.S. Trustee
Box 1539
San Antonio, Texas 78295-1539

Matthew W. Migliore
Linebarger
711 Navarro St., #300
San Antonio, TX 78205

_(s) Thomas W. McKenzie_
THOMAS McKENZIE
