IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| IN RE | § | CASE NO. 09-53118 |
| | § | |
| GARY JOEL KATLEMAN | § | |
| | § | |
| AND | § | |
| | § | |
| JOEL M. KATLEMAN | § | CASE NO. 09-53125 |
| | § | |
| | § | |
| DEBTORS | § | CHAPTER 11 CASES |

## JOINT DISCLOSURE STATEMENT TO JOINT PLAN OF REORGANIZATION OF GARY JOEL KATLEMAN AND JOEL M. KATLEMAN

## I.      INTRODUCTION

On August 17, 2009, Gary Joel Katleman and Joel M. Katleman (hereinafter the "Debtors") filed separate voluntary Petitions under Chapter 11 of the U.S. Bankruptcy Code. Since that time each has continued to operate as Debtor in Possession pursuant to the provisions of Section 1108 of the Bankruptcy Code. The two cases are not jointly administered nor consolidated. However, each debtor is jointly and severally obligated on a common debt owed to a common creditor, EF Village Funding LP ("EF Funding") and each is jointly and severally obligated on a guarantee to Falcon International Bank ("Falcon Bank") of loans made to Dominion Village, Ltd. ("Dominion Village").

This Joint Disclosure Statement To Joint Plan of Reorganization (hereinafter "Disclosure Statement") has been prepared by the Debtors pursuant to Section 1125 of the Bankruptcy Code, which requires that creditors receive a written disclosure statement containing sufficient information about the Debtors to enable creditors to make an informed and intelligent decision regarding the Plan of Reorganization (hereinafter "Plan"). Prior to the solicitation of your vote on the Plan, and as required by the Bankruptcy Code, the Bankruptcy Court has approved this Disclosure Statement as containing adequate information on Debtor.

In addition to this Disclosure Statement and accompanying Plan, you will also receive an order of the Court setting the hearing on the confirmation of the Plan and establishing deadlines for casting your vote or filing objections to confirmation. Mailing instructions are included in your Ballot. YOUR VOTE IS IMPORTANT. In order for the Plan to be accepted, at least two-third (2/3's) in amount and one-half (½) in number of the voting creditors in each class must affirmatively vote for the Plan. Even if all classes of claims accept the Plan, the Bankruptcy Court may refuse to confirm the Plan. Among other things, Section 1129 requires that the Plan be in the best interests of the creditors and other parties in interest, and generally requires that the holders of the claims not

receive less than would otherwise be realized if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code.

In appropriate circumstances, the Bankruptcy Court may confirm a Plan even though less than all of the classes of claims accept the Plan. The circumstances warranting confirmation notwithstanding the vote of a dissenting class or classes of creditors are set forth in Section 1129(b) of the Bankruptcy Code. Except as otherwise provided in the Plan, the Order of Confirmation, or Section 1141(d), confirmation of the Plan will discharge the Debtor from all of its debts. Confirmation makes the Plan binding on the Debtor and all of its creditors, regardless of whether or not they have accepted the Plan.

A.    The Debtors

The Debtors are individuals who reside in San Antonio, Texas.

B.    The Joint Disclosure Statement

Pursuant to Section 1125(b) of the Bankruptcy Code (Title 11 of the United States Code, hereinafter referenced as 11 U.S.C. section number), a precondition to solicitation of acceptances and rejections of a Plan of Reorganization from holders of claims or interests in the bankruptcy estates is that the holders be furnished with a copy of the Plan or a summary of the Plan and a written Disclosure Statement which contains "adequate information".

"Adequate information" means:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the Debtor and the condition of the Debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the Plan, but adequate information need not include such information about any other possible or proposed Plan.

11 U.S.C. 1125(a)(1).

Whether or not a disclosure statement contains adequate information is determined by the Court upon notice and hearing. 11 U.S.C. 1125(b). All parties in interest may participate in this determination. After the disclosure statement is approved by the Court, a hearing will be set on confirmation of the Plan and a Plan package which includes copies of the Order Approving Disclosure Statement, Plan, this Disclosure Statement and Ballot will be sent to the parties entitled to vote on the Plan.

C.     Chapter 11

Chapter 11 is a portion of the Bankruptcy Code which provides businesses with protection from its creditors while it seeks to reorganize its business affairs, including the repayment of its debts. The terms of the proposed reorganization are embodied in a Plan of Reorganization. While the Bankruptcy Code gives the Debtor many aids in the reorganization of its financial affairs, these aids are balanced with rights and protections afforded to creditors. Confirmation of a Plan of Reorganization is the objective of the Debtor in a Chapter 11 Reorganization Case. Performance of the confirmed Plan is the objective of the Reorganized Debtor. The Plan is the terms by which the claims against and interests of the Debtor is satisfied.

D.     The Process of Confirmation

1.     Hearing on Confirmation. Confirmation of a Plan is simply approval by the Court. This approval is sought by the Plan proponent at the hearing on confirmation. In order to obtain approval of the Court, the Plan proponent must show that the Plan meets all requirements for confirmation.

2.     Requirements for Confirmation. The requirements for confirmation are listed in 11 U.S.C. Section 1129(a). These requirements are part of the balancing of rights and aids between the Debtor and its creditors. Certain of the requirements for confirmation necessitate the solicitation of ballots from the holders of claims against and interests in the Debtor indicating either their acceptance or rejection of the Plan. Section 1129(a) does not require that each and every holder of a claim against or interest in the Debtor's vote to accept the Plan in order for it to be confirmed by the Court. First, only those holding claims or interests which are in classes which are impaired are entitled to vote. Impairment is defined in 11 U.S.C. 1124.

Impairment basically means an alteration of the legal, equitable or contractual rights of the holder of the claim or interest. The Plan proponents must assert in the Disclosure Statement whether or not each class is deemed by them to be impaired. The proponents' conclusion may be disputed by a creditor and the dispute resolved by the Court. If a Plan impairs or changes the rights of any creditor, it must be accepted by at least one Class of impaired claims. Second, only those ballots that are properly completed and timely delivered are counted. Third, of those voting in each class, only a majority of the claims in number and at least two-thirds (2/3) in amount are needed for the acceptance of the Plan by that class.

Even if all Classes of claims and interests accept the Plan, its confirmation may be denied by the Bankruptcy Court for the failure to meet some other requirement of Section 1129 of the Bankruptcy Code. Among those requirements is a requirement that the Plan be in the best interests of claimholders and interest holders. That generally requires that the value to be distributed to claimholders and interest holders may not be less than such parties would receive if the Debtor was liquidated under Chapter 7 of the Code.

3. Cramdown: The Court may confirm a Plan even though a class of claims or interest holders rejects the Plan. Confirmation of a Plan over the rejection by one or more classes of claims or interests is generally referred to as "cram down". In order for the Plan to be confirmed in spite of the rejection by a class of claims or interests, the proponent of the Plan must show that the Plan does not discriminate unfairly and is fair and equitable with respect to each class of claims or interests that is impaired and has not accepted the Plan.

Section 1129(b)(2) provides that the following standards are among the issues to be considered in determining whether the Plan is "fair and equitable" with respect to a particular class:

<u>Secured Claims</u>. The Plan is fair and equitable with respect to each class of secured claims if it provides that either:

1. The holders are to retain their lien, whether the collateral is retained by the Debtor or transferred to another entity, to the extent of the allowed amount of their secured claim, and are to receive deferred cash payments totaling not less than the allowed amount of their claims and having a present value of not less than the value of the collateral or, in the alternative, secured creditors must receive their collateral in satisfaction of new secured claims.

2. The collateral is to be sold in a sale permitting the holder to "bid in" free and clear of holder's lien, with such lien to attach to the proceeds of such sale, and the treatment of the lien on such proceeds under either clause (1) or (3) hereof; or

3. The holders are to receive the "indubitable equivalent" of their claims.

<u>Unsecured Claims</u>. The fair and equitable requirement in the context of a class of unsecured claims requires that either:

1. The holders are to receive property with a present value equal to the allowed amount of their claims; or

2. No holders in a class junior to the rejecting class are to receive any property.

## II.   **REPRESENTATIONS**

The statements contained in this Disclosure Statement are made as of the date of this Disclosure Statement unless another time is specified. Except as stated herein, no other representations concerning the Debtor, its business operations, the value of its property, or the value of any benefits offered to you in the Plan are authorized. ANY REPRESENTATIONS OR INDUCEMENTS WHICH ARE CONTRARY TO THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION, and such representations or inducements and their origin should be immediately reported to R. Glen Ayers, Langley & Banack, Inc., Counsel for the Debtor, Gary Joel Katleman, 745 E. Mulberry, Suite 900, San Antonio, Texas 78212; Telephone: (210) 736-6600 and William B. Kingman, counsel for

the Debtor Joel M. Katleman, 4040 Broadway, Suite 450, San Antonio, Texas; Telephone: 210-829-1199.

THE DEBTORS AND THEIR COUNSEL HAVE MADE EVERY EFFORT TO INSURE THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS ACCURATE. WE CANNOT, HOWEVER, WARRANT THAT ALL OF THE DATA IS COMPLETELY ACCURATE, THOUGH WE FEEL IT IS MATERIALLY ACCURATE TO OUR BEST KNOWLEDGE, INFORMATION AND BELIEF. THE INFORMATION IN THIS DISCLOSURE STATEMENT HAS NOT BEEN SUBJECT TO AN INDEPENDENT AUDIT, AND FINANCIAL INFORMATION HAS BEEN BASED UPON OUR INTERNAL RECORDS. IF ANY STATEMENTS OF FINANCIAL MATTERS WERE MADE BY THIRD-PARTY ACCOUNTING PROFESSIONALS ACCOMPANY THIS DISCLOSURE STATEMENT, THEY WILL CONTAIN A DISCLAIMER REQUIRED OF UNAUDITED FINANCIAL INFORMATION. FURTHER, YOU SHOULD NOT CONSTRUE THE BANKRUPTCY COURT'S APPROVAL OF THIS JOINT DISCLOSURE STATEMENT AS AN ENDORSEMENT OF THE JOINT PLAN OR A GUARANTY OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION PRESENTED HEREIN.

The Debtors have expended considerable time in devising a Plan which each believes to be financially feasible and fair to creditors. Consequently, the Debtors urge you to vote for acceptance of the Plan.

## III.    **INFORMATION CONCERNING THE DEBTOR:  Gary Joel Katleman**

A.    History of the Debtor:  Gary Joel Katleman

1. Description of the Debtor's Business Operations

Debtor Gary Katleman has been an employee, partner or member of several developers and operator of senior living facilities, the most recent of which is Independence Village in San Antonio Texas. The Debtors' success as a participant in that development led the debtor and his father, Joel M Katleman to attempt to duplicate their success with a similar development at the Dominion Village. Mr. Joel M. Katleman is the joint proponent of this Disclosure Statement and the Plan which it describes.

Entities controlled by the Katlemans and Joel Pollack began the Dominion Village project with a $17.0 million revolving line of credit from Falcon Bank. As of the Petition date, according to Falcon Bank's proof of claim, the guaranteed obligation was $16,478,747. The developers had or have to date invested $2,215,000 of their own money as equity or loans to Dominion Village. The Katlemans, Mr. Pollack, and "The Joel Katleman Irrevocable Trust" each guarantee the Falcon Bank loan.

While the Dominion Village project was initially within projections, delays in obtaining necessary development financing resulted in increased carrying costs, and the Debtors and a co-developer, Mr. Joel Pollack, entered into a financial arrangement with EF Funding. The three solicited an investment from EF Funding to provide additional capital. Under the general terms of the deal, EF Funding invested $8.5 million in equity. In addition,

EF Funding received a preferential return on its investment. The Debtors guaranteed that EF Funding would receive the $8.5 million contributed and the preferential return. The economy began to sour. When EF Funding determined that the project was not living up to expectations, it made demand, then filed suit. On the eve of a summary judgment hearing on EF Funding's lawsuit, the Debtor's filed bankruptcy. Mr. Pollack also guaranteed this debt, and EF Funding took a judgment against Mr. Pollack in the amount of $8.5 million. Mr. Pollack has not filed bankruptcy but the Debtors believe that he does not have the resources to respond to the judgment in any significant way.

The Debtors have not asserted any defense to the claims of EF Funding for principal totaling approximately $8.5 million. The claim filed by EF Funding asserts that as of the date of the Petition, the total debt to it was $9,356,920.00, which it alleges includes interest but no attorney's fees or expenses; however, attorney's fee claims are "reserved" according to the Proof of Claim

Gary Katleman's and Joel Katleman's inability to service his personal obligations to EF Funding left were left with no choice but to file the Petition.

B.    Results of Operations as Debtor in Possession

Post-petition, the Debtor has continued his business operations at Independence Hill, Independence Village and the Dominion Village. The Debtor's income has remained stable and the development of the Dominion Village project has progress. At present, Debtor and other managers are negotiating for the construction, with HUD, of an Assisted Living Center. Such a project will enhance the Dominion Village project and make it more attractive to new buyers. The loan from Falcon Bank on Dominion Village has been maintained in a "current" status. Post-petition, the Debtor has filed all Monthly Operating Reports, with a copy of the most recent Monthly Operating Report being attached hereto as Exhibit "A". .

C.    Estimated Future Income and Expenses

Each Debtor has attached as Exhibit "B" a schedule showing future payments and sources of funds.

Gary Katleman will continue to own his interests in the Independence Hill and Independence Village projects and will continue to develop the project at the Dominion Village. He will service obligations and plan payments from current income.

Exhibit B reflects the income of both Debtors.

D.    Future Management of the Reorganized Debtors

The Debtor will continue to manage his own financial affairs as he did prior to bankruptcy, subject to the terms of the Plan of Reorganization.

E.     Cause of the Bankruptcy Filing

The Debtor's inability to service his personal obligations to EF Funding left the Debtor with no choice but to file the Petition.

F.     Changes to Operations

As the Plan describes, the Debtor does not intend to modify his operations. The sound progress of the Dominion Village project and the success of Independence Hill and Village each show that the business operations of Mr. Gary Katleman and Dial Communities are both sound. However, if financial considerations dictate, the Katlemans and Mr. Pollack have an alternative development scheme, which would continue the development of Dominion Village as a single family and condominium development.

## IV.     INFORMATION CONCERNING THE DEBTOR:  JOEL M. KATLEMAN

A.     History of the Debtor:  Joel M. Katleman

1,     Description of the Debtor's Business Operations

The Debtor has been an employee, partner or member of several developers and operator of senior living facilities, the most recent of which is Independence Village in San Antonio Texas. The Debtor's success as a participant in that development led the debtor and his son, Gary Katleman to attempt to duplicate their success with a similar development at the Dominion Village. Mr. Gary Katleman is the Joint proponent of this Disclosure Statement and the Plan which it describes.

Entities controlled by the Katlemans and Joel Pollack began the Dominion Village project with a $17.0 million revolving line of credit from Falcon Bank. As of the Petition date, according to Falcon Bank's proof of claim, the guaranteed obligation was $16,478,747. The developers had or have to date invested $2,215,000 of their own money as equity or loans to Dominion Village. The Katlemans, Mr. Pollack, and "The Joel Katleman Irrevocable Trust" each guarantee the Falcon Bank loan.

While the Dominion Village project was initially within projections, delays in obtaining necessary development financing resulted in increased carrying costs, and the Debtors, and a co-developer, Mr. Joel Pollack, entered into a financial arrangement with EF Funding. The three solicited an investment from EF Funding to provide additional capital. Under the general terms of the deal, EF Funding invested $8.5 million in equity. In addition, EF Funding received a preferential return on its investment. The Debtors guaranteed that EF Funding would receive the $8.5 million contributed and the preferential return. The economy began to sour. When EF Funding determined that the project was not living up to expectations, it made demand, then filed suit. On the eve of a summary judgment hearing on EF Funding's lawsuit, the Debtor's filed bankruptcy. Mr. Pollack also guaranteed this debt, and EF Funding took a judgment against Mr. Pollack in the amount of $8.5 million. Mr. Pollack has not filed bankruptcy but the Debtors believe that he does not have the resources to respond to the judgment in any significant way.

The Debtors have not asserted any defense to the claims of EF Funding for principal totaling approximately $8.5 million. The claim filed by EF Funding asserts that as of the date of the Petition, the total debt to it was $9,356,920.00, which it alleges includes interest but no attorney's fees or expenses; however, attorney's fee claims are "reserved" according to the Proof of Claim.

B.    Results of Operations as Debtor in Possession

Post-petition, the Debtor has continued his business operations at Independence Village and the Dominion Village. The Debtor's income has remained stable and the development of the Dominion Village project has progress. At present, Debtor and other managers are negotiating for the construction, with HUD, of an Assisted Living Center. Such a project will enhance the Dominion Village project and make it more attractive to new buyers. The loan from Falcon Bank on Dominion Village has been maintained in a "current" status. Post-petition, the Debtor has filed all Monthly Operating Reports, with a copy of the most recent Monthly Operating Report being attached hereto as Exhibit "A". .

C    Estimated Future Income and Expenses

Each Debtor has attached as Exhibit "B" a schedule showing future payments and sources of funds.

Joel Katleman created trusts and a Family Limited Partnership pre-petition. Those structures will be ignored for purposes of this Plan, and Joel Katleman will service the Plan payments as if those structures did not exist, from the income of those entities.

Exhibit B reflects the income of both Debtors.

D.    Future Management of the Reorganized Debtor

The Debtor will continue to manage his own financial affairs as he did prior to bankruptcy subject to the terms of the Plan of Reorganization. The Debtor's key personnel will not change.

E.    Cause of the Bankruptcy Filing

The Debtors' inability to service his personal obligations to EF Funding left the Debtor with no choice but to file the Petition.

F.    Changes to Operations

As the Plan describes, the Debtor does not intend to modify its operations. The sound progress of the Dominion Village project and the success of Independence Village each show that the business operations of Mr. Joel Katleman and Dial Communities are both sound. However, if financial considerations dictate, the Katlemans and Mr. Pollack have an alternative development scheme, which would continue the development of Dominion Village as a single family and condominium development

# V.     ANALYSIS AND VALUATION OF PROPERTY

## A.    Real Property

The Debtors each owns the following real property and improvements:

Gary Katleman owns a homestead located at 7618 Woodhaven, San Antonio, Texas. That homestead is wholly exempt. Based upon information and belief, the Debtor estimates that the equity in his homestead is around $200,000. Gary Katleman will reaffirm this debt and the liens securing the debt. There are no defaults.

Joel Katleman owns a home in San Antonio which he has sold to Joel Pollack under a contract for deed. Mr. Pollack makes the monthly payments on the house. Joel Katleman has a note receivable from Mr. Pollack in the amount of approximately $31,350.00.

## B.    Personal Property

Attached as Exhibit "C" is the Schedule B - Personal Property filed by each Debtor with the Court.

### 1.    Gary Katleman

Gary Katleman owns a limited amount of exempt personal property, including household goods, clothing, an expensive watch and a motorcycle. These items of personal property are exempt. His equity in the watch and motorcycle, on information and belief, is less than a total of $6,000. The household goods and clothing have very limited liquidation value. He also has a retirement account worth approximately $96,000.00.

Mr. Gary Katleman currently (as of March 31, 2010) has non-exempt cash in accounts and cash on hand of about $140,000. He has a few other miscellaneous non-exempt assets worth about $10,000.00.

His other valuable personal property consists of his interests in the Independence Hill and Independence Village projects and his interests in the Dial Communities, Inc. A valuation by O'Connor & Associates of Houston, Texas, has valued these assets, which are not exempt, at a total cash present value of $4.2 million. In addition, he owns interests in Dominion Village and guarantees the debt owed to Falcon Bank and EF Funding.

His interests are:

### a.    Independence Hill and Village:

Independence Hill Assisted Living is owned by Stone Oak Villas, II, Ltd. Stone Oak Villas II, Ltd is owned by Stone Oak Holding, LP. Independence Hill Retirement Community is owned by Stone Oak Villas I, Ltd., which is also an asset of Stone Oak Holding, L.P. Mr. Gary Katleman owns interests in Stone Oak Holding, L.P, (collectively

"Independence Hill"). He owns 47.1265% of the limited partner interests and 48.42% of the incorporated general partner. Independence Hill is valued at $3,575,000.

Independence Village Retirement Community is owned by Independence Village Ltd. Mr. Gary Katleman owns interests in Independence Village, Ltd. He owns 19.75% of the limited partner interests and 50% of the incorporated general partner. These interests are valued at $554,100.

In addition, Mr. Gary Katleman owns 24.5% of Dial Communities, Inc., which manages Independence Hill. Mr. Joel Katleman also owns 24.5% of Dial Communities, Inc. The balance of the interests is owned by investors in Omaha, Nebraska. The Dial Communities interests are valued at $50,000.

None of these assets is encumbered by secured debt. The interests are illiquid and subject to certain the rights of other owners. Transfer of the interests does not transfer control.

    b.    <u>Dominion Village</u>

While Gary Katleman, Joel Katleman, Joel Pollack and the Joel Katleman Irrevocable Trust have invested a total of $2,215,000 of their own cash assets in the Dominion Village project, the project at present has no recoverable value. It is partially complete and the satisfaction of the first lien held by Falcon Bank of almost $17,000,000 would certainly exhaust the value of the property. In addition, the EF Funding claims and the claims of persons who have purchased homes in the development would come before the interests of the limited partnerships in which Gary Katleman has invested.

EF funding is entitled to recover its $8.5 million debt plus interest and attorney's fees (the proof of claim amount is approximately $9.57 million) from any sale or other realization on the value of Dominion Village and is entitled to a preferential return. Each of the member/residents ("purchasers") of homes in the Dominion Village is entitled to a refund of member fees, which total, in the aggregate for all members, $7,867,000.

In other words, sale of the Dominion Village Project in a partially completed status would require a purchaser to pay in excess of $34.0 million before the project paid the current development group any money.

However, on completion, the Dominion Village project will have a net equity value in excess of debt and, given the success of the Independence Hill and Village projects and the location of the Dominion Village project, the Debtor and his father believe that continued support of and completion of Dominion Village will greatly enhance their estates.

In connection with the foregoing, Gary Katleman and Joel Katleman each own a 50% interest in the incorporated general partner of Dominion Village. Gary Katleman owns a limited partnership interest equaling 31.68% of the partnership and for purposes of this plan, Joel Katleman shall be considered as also owning a limited partnership interest equaling 31.68% of such partnership.

Finally, the Debtor and Joel Katleman each own an interest in Sundial Development, LLC, which is the general contractor at the Dominion Village. This entity has no significant net income. The Katlemans do not receive a salary or benefits. They believe that the value of any interest is zero. Mr. Gary Katleman also has loaned $530,000 to Dominion Village, which is not presently collectable.

2. <u>Joel M. Katleman</u>

Joel Katleman owns a limited amount of exempt personal property, including household goods and clothing.. These items of personal property are exempt.

Mr. Joel Katleman currently (as of March 31, 2010) has non-exempt $33,000 cash on hand. He also has a note receivable from Joel Pollack with a current principal balance of approximately $31,360.00.

His valuable personal property consists of his interests in Independence Village project and his interests in the Dial Communities, Inc. A valuation by O'Connor & Associates of Houston, Texas, has valued these entities, which are not exempt, at a total cash present value of $1.7 million. In addition, for purposes of this plan, he will be considered as owner of interests in Dominion Village and guarantees the debt owed to Falcon Bank and EF Funding.

C. <u>Leases and Executory Contracts</u>

1. <u>Gary Katleman</u>

Attached hereto as Exhibit "D" is a copy of Schedule G - Executory Contracts and Unexpired Leases, which lists all leases and executory contracts to which Gary Katleman is a party. The Debtor is assuming all leases scheduled on Exhibit "D." These leases consist of three automobile leases. The most expensive lease is for a Lexus 460; however, the Debtor is reimbursed for this lease cost as a part of his compensation from Dial Communities. Gary Katleman is also obligated on a lease for a Honda driven by a Dial Communities employee, for which he is also reimbursed by Dial. The third lease is for a car driven by his daughter, and the lease payments are $540 a month. The Debtor does not believe that there is liquidation value or "equity" in any of the three leases. He intends to assume these leases. The leases are current; there are no cure costs anticipated.

2. <u>Joel M. Katleman</u>

Joel Katleman has two vehicle leases, one with World Omni Finance and one with Toyota Financial Corporation. Joel Katleman will assume these leases. The leases are current; there are no cure costs anticipated

D.    Liquidation Value

    1.    Gary Katleman

Gary Katleman's analysis of the distribution to creditors in a Chapter 7 liquidation is attached as a separate "Exhibit D" (which also contains the liquidation analysis of Mr. Joel Katleman's assets) and is based  partly upon the analysis provided by O'Connor & Associates; other values were developed by Mr. Gary Katleman, with the legal assistance of counsel.

Liquidation of the interests held by Gary Katleman in Dial Communities and Independence Hill and Village would generate $4,200,000 on liquidation of his interests in Dominion Village would generate a claim by Falcon Bank and others of not less than $6,000,000, grossly diluting the any distribution from of the Independence Village and Dial Communities interests.

If the Dominion Village project were to collapse, or simply be terminated today, the value of Gary Katleman's assets would be so diluted that recovery to creditors would drop to around only pennies on the dollar on a ratable basis, after payment of priority claims.

The liquidation value of Gary Katleman's exempt property is limited and as shown on Exhibit D would generate about $206,000, although the proceeds would be exempt under the Bankruptcy Code and Texas law.

    2.    Joel M. Katleman

Joel Katleman's analysis of the distribution to creditors in a Chapter 7 liquidation is attached as a separate "Exhibit D" (which also contains the liquidation analysis of Mr. Joel Katleman's assets) and is based  partly upon the analysis provided by O'Connor & Associates; other values were developed by Mr. Joel Katleman, with the legal assistance of counsel.

Liquidation of the interests held by Joel Katleman in Dial Communities and Independence Village would generate $1,700,281.00 and, on liquidation of his interests in Dominion Village would generate a claim by Falcon Bank and others of not less than $6,000,000, grossly diluting the any distribution from of the Independence Hill and Village and Dial Communities interests.

If the Dominion Village project were to collapse, or simply be terminated today, the value of Joel's Katleman's assets would be so diluted that recovery to creditors would drop to around only pennies on the dollar on a ratable basis, after payment of priority claims.

The liquidation value of Joel's Katleman's non-exempt property is limited and as shown on Exhibit D would generate about $75,000.00.

# VI.    SUMMARY OF PLAN OF REORGANIZATION

A.    Classification and Treatment of Claims

## Administrative Claim

**Class 1A and 1B Claims:** The Class 1 claims consist of the professionals who have provided services to the Debtor during the pendency of this Chapter 11 case. Class 1 does not include other administration priority claims allowed under 11 U.S.C. § 503. Those will be paid in the ordinary course as priority claims under 11 U.S.C. § 507(a). The estimated amounts of such claims are as follows, divided into Classes 1A, for Gary Katleman, and 1B, for Joel Katleman:

| Class 1A | |
|---|---|
| Langley & Banack, Inc. (Attorneys for Gary Katleman) | $ 20,000.00 |
| O'Connor & Assoc's (Appraisers) (1/2 of the fee) | $ 27,000.00 |
| William B. Kingman (Attorney for Joel Katleman) | $35,000.00 |
| O'Connor & Assoc's (Appraisers) (1/2 of the fee) | $ 27,000.00 |
| Total Estimated Professional Claims | $109,000.00 |

The amount of the professional fees disclosed above is an approximate amount. It is unknown at this time exactly how much money will be incurred in professional fees in this Chapter 11 case. A final determination cannot be made until such time as the case is closed as to reasonable professional fees for the provision of whatever services become necessary in this Chapter 11 case. Any other allowed costs and expenses of administration of the Debtor's Chapter 11 bankruptcy case are also included as Class 1 claims. These claims will be paid in full at confirmation, less any retainers already received, after approval by the Court of said fees. The anticipated administrative expenses of the Debtor are moderate for a case of this size.

Langley & Banack holds a retainer balance in excess of the amount of the attorneys' fees and expenses currently accrued. Therefore, the Langley & Banack distribution under the Plan set out above is the estimate of the amount necessary to conclude the case.

Other than Attorneys and Appraisers, there are no known accrued and unpaid administrative expenses.

**Class 1A and 1B Claims:** These will be paid as allowed by the Court from the retainers received or when funded by income and allowed by the Court.

These claims are not impaired and will not vote on the Plan.

## Secured Claims

**Class 2A and 2B Claims:** The Class 2 claims consist of the secured claims of the taxing entities located in Bexar County. These are secured by statutory first liens. The secured Class 2A claim on the homestead of Gary Katleman is $15,000. The Class 2 B claim on real property owned by Joel Katleman in San Antonio is approximately

$8,100.00_. These claims will be paid in the ordinary course. These obligations will be assumed. The taxing authorities will retain their liens.

The Class 2A and 2B claims are not impaired the Plan of Reorganization and will not vote on the Plan.

Class 3A and 3B Claims: The Class 3A claim consists of the secured claim of Bank of America, which holds a first lien upon Gary Katleman's exempt homestead. The amount of the debt is $420,000 and is fully secured. The secured creditor will retain its lien, the obligation will be assumed and reaffirmed under the Plan, and this debt will be paid in the ordinary course in payments of 4,200 per month. Insurance and other covenants will be honored.

The class 3B claim consists of the secured obligation of Joel M. Katleman to BAC Home Loans Serving who holds a first lien real property located at 24611 Fairway Springs in San Antonio, Texas and is fully secured. The secured creditor will retain its lien, the obligation will be assumed and reaffirmed under the Plan, and this debt will be paid in the ordinary course by Joel Pollack. Insurance and other covenants will be honored. If Joel Pollack defaults, then Joel Katleman will assume the obligations.

The Class 3A and 3B claims are not impaired under the Plan and will not vote on the Plan.

Priority Unsecured Claim

There are no known priority claims other than taxes owed to the IRS for the year 2009; those taxes will be paid in the ordinary course as they come due and are not treated under the Plan.

Unsecured Claims

Class 4 Claims: The Class 4 unsecured claims of EF Funding against both Debtors. The obligation under this guaranty, according to the EF Funding Proof of Claim, is $9.357 million.

This claim is not secured. The debt is joint and several. Joel Pollack is jointly liable with the Debtors up to an amount of $8.5 million (plus accrued judgment interest in an unknown amount). Mr. Pollack is not expected to contribute significantly to this obligation.

The Debtors intend to satisfy this claim from income until the total of the present value of the Debtors assets have been paid over to its creditors, on a pro-rata basis. EF Funding, which is entitled to receive the present value of its claim, will not receive interest on any unpaid balance because under §1129(b)(2)(B)(ii) and § 1115 the Debtors will each pay out to creditors on a ratable basis the full value of all assets owned by each except for exempt property based upon the values of the Debtors' assets as of the date of Confirmation.

Exhibit E attached shows the income from the Debtors' assets and the application to the debt of EF Funding. The payments to EF Funding will continue for 5 years at which time the Debtors will pay the balance due and owing by a financing or sale of assets in order to fund a balloon payment.

Interest at the federal judgment rate will be paid on the value of distributable assets in order to pay this and other unsecured creditors the present value of the Debtors' distributable estates. The actual claims of the unsecured creditors will not receive interest.

The Class 4 claim is impaired under the Debtors' Plan of Reorganization and will vote on the Plan.

Class 5 Claims: The Class 5 claims of the unsecured, contingent guaranty claims of Falcon Bank. The Falcon Bank loan is not presently in default, but both Debtors will be required to continue to fund the development of Dominion Village. The funding by the Debtors is limited to the ratable share of the assets of the two Debtors which would be allocated to the full amount of the debt of Falcon were there a default, so that the ratable share of the obligations of the two Debtors to EF Funding and other unsecured creditors is not diluted. The Debtors estimate if there were a default and foreclosure by Falcon Bank, they would be liable for not less than $10.0 million under the terms of the guaranty. Again, Joel Pollack is not able, in the Debtors' joint opinion, to contribute to any deficiency due to Falcon Bank.

The Debtors intend to satisfy any current claim to Falcon Bank by continuing to fund the development of Dominion Village and by maintaining the Falcon Bank obligation of almost $17,000,000 in a "current" status.

Further, as additional collateral to support its guarantees, Falcon Bank will, pursuant to the Plan, receive a Plan-created lien against the non-exempt personal property assets of Gary Katleman and the non-exempt personal property assets of Joel M. Katleman.

Class 5 is impaired under the Plan and will vote on the Plan.

Class 6 Claims: The Class 6 claims consist of the unsecured obligations owed to the other general unsecured creditors of Gary Katleman, which total approximately $10,000, and does not include sums owed to the insider Independence Village (see Class 8). The claims will be paid in full within 90 days of the date of Confirmation as a "convenience class."

Class 6 is impaired under the Plan will vote on the Plan.

Class 7 Claims: The Class 7 claims consist of the unsecured obligations owed to the general unsecured creditors of Joel Katleman, which, at most, total approximately $20,298.00, and does not include sums owed to the insider Independence Village (see Class 8). The claims will be paid in full within 90 days of the date of Confirmation as a "convenience class."

Class 7 is impaired under the Plan and will vote on the Plan.

Class 8 Claims: The Class 8 claims consist of the unsecured claim held by an insider, Independence Village. The Debtors jointly owe Independence Village about $1.7 million representing advances and other claims accrued over the last several years. This claim is by definition a claim of an insider. The claim will be paid ratably with the Claims of EF Funding and Falcon Bank. While the claim is impaired, and while Independence Village may vote to accept or reject the Plan, a vote in favor of the Plan by Class 8 will not satisfy the requirements of the Bankruptcy Code that at least one creditor class that is impaired must accept the Plan in order for Confirmation to occur.

The Class 8 claims are deemed to be impaired under the Plan and will vote on the Plan.

Class 9 Interests: Class 11 claims consist of the interests in each Debtor held by each Debtor. The interests are unimpaired; each Debtor will retain their ownership interests in all property, including exempt property.

Class 9 interests are deemed unimpaired under the Plan and will not vote on the Plan.

B.    Summary of the Mechanics/Implementation of Debtor's Plan of Reorganization

Attached to this Disclosure Statement as Exhibit "F" is a complete copy of the Debtor's Proposed Plan of Reorganization. For the specific details of the Plan of Reorganization, reference should be made to the Plan in its entirety. The summary provided below is merely for the convenience of anyone reading the Disclosure Statement and to the extent that this Disclosure Statement in any way conflicts with the actual Plan, the terms of the Plan will govern.

The Plan is simple; the Debtors will request the court to value their non-exempt property and will pay out the value of that non-exempt property to the creditors, who will receive the present value of their claims and the present value of the Debtors' interests in various items of non-exempt property.

C.    Payment of Administrative Claims

All allowed administrative claims will be paid in full on or after the Plan's Effective Date in accordance with the provisions of 11 U.S.C. §1129(a)(9)(A), as agreed to between a particular administrative claimholder and the Debtor. The Debtor anticipates paying administrative claims from post-confirmation cash flow.

D.    Feasibility of the Plan.

The Plan is feasible because the income generated from Independence Hill and Village and Dial Communities is sufficient to fund the Plan.

E.      Claims Allowance Procedure

The Debtor will file any claims objections on or before forty-five (45) days from the Plan's Effective Date. At present, the Debtor is attempting to resolve any disputes regarding claims with each particular creditor. The Debtor is hopeful that such negotiations will lead to an amicable resolution of any claims disputes; however, there is no guarantee that the negotiations will lead to a resolution of any disputes.

F.      Retention of Jurisdiction

The Court retains jurisdiction as set out in the Plan (See Article VIII).

G.      Interest Retained by the Debtor

Each Debtor is retaining its current ownership interests in its real and personal property.

## VII.      ALTERNATIVES TO THE DEBTORS' PLAN

The Debtors do not believe that any other Plan other than the one proposed is feasible for the reorganization of the Debtors. The Debtors do not believe any liquidation (through this Chapter 11 case or by a Chapter 7 trustee) of assets will result in the payment of the any significant amount of the debts owed, for a chapter 7 or other liquidation will trigger the contingent liability on the guarantee to Falcon Bank of $16.5 million. The Debtors believes that unless this Plan is confirmed, the result will be a Chapter 7 liquidation, with a possibly delayed and certainly much smaller distribution to creditors. The delay would result from the necessity of liquidating the Independence Hill, Independence Village and Dial Communities interests.

In the event of Chapter 7 liquidation, the Bankruptcy Code would provide for the priorities of payment. Ordinarily, secured creditors would be paid from a sale of assets or allowed to foreclose. However, the only secured creditor of Gary Katleman is secured by his homestead; that is a debt he would certainly reaffirm (assume and pay). Given the nature of the assets owned by both Katlemans at Independence Hill, Independence Village and Dial Communities, a quick sale is very unlikely. After the sale, the cash would be distributed first to priority creditors, including attorneys, any federal tax claims, and so forth. The balance would be distributed ratably between the debt owed to general creditors (Classes 6 and 7), the insider creditor Independence Village (Class 8), EF Funding (Class 4), and Falcon Bank (Class 5).

Based on the foregoing, the Debtor believes that its operating Plan is superior to a Chapter 7 liquidation. A Liquidation Analysis prepared by the Debtor is attached hereto as Exhibit "E".

## VIII.        RISK TO CREDITORS UNDER THE DEBTOR'S PLAN

The principal risk that creditors will incur under the Debtor's Plan is that the Debtors will be unable to operate Independence Hill, Independence Village and Dial Communities successfully over the next five years in order to fund the Plan.

## IX.        TAX CONSEQUENCES

The Debtors are taxable individuals and federal income taxes are payable by the Debtors. It is the Debtor's opinion that minimal adverse tax consequences will occur to the Debtor as a result of the reorganization and any adjustment and release of debt. Each Debtor files on a calendar tax year.

## X.        LITIGATION

On the date of the petition, each Debtor was a party to a State Court lawsuit filed by EF Funding filed in the 131st Judicial District Court, Bexar County, Texas. There has been no significant post-petition litigation.

## XI.        RELATIONSHIP OF DEBTORS WITH AFFILIATES

The Debtors' relationships with affiliates are fully disclosed in the Statement of Financial Affairs filed in the case.

## XII.        PREFERENTIAL OR VOIDABLE TRANSFERS

Gary Katleman is unaware of any preferential or voidable transfers at this time. EF Funding has asserted, informally and through its counsel, that EF Funding is concerned that the gambling losses scheduled in the Statement of Financial Affairs cannot be fully documented. Gary Katleman asserts that he knows of no claims creditors may have concerning those scheduled gambling losses and denies any impropriety (other than the very act of gambling and losing that sum of money).

Prepetition, Joel M. Katleman engaged in a number of estate planning transactions and transfers, creating, among other entities, the Joel M. Katleman Irrevocable Trust and the Joel Katleman Family Limited Partnership. These structures will be ignored in this Plan, for all appear to be potentially subject to challenge under 11 U.S.C. § 548. Furthermore, Joel Katleman shall initiate claims to recover any additional transfers that are subject to challenge under 11 U.S.C. § 548 and any preferential transfers. These transfers include any transfers of jointly managed community property that may have been transferred to his spouse's sole management prior to the petition date.

## XIII.        SUMMARY OF SIGNIFICANT ORDERS ENTERED

There are no significant orders other than an order of the Court permitting the Debtor, Gary Joel Katleman, to advance funds to Dominion Village in an amount of $226,000.00. Mr. Katleman does not expect recovery of this sum within the next year or so. This is not listed as an "asset".

## XIV.      MISCELLANEOUS DISCLOSURES

A.      Modification of the Plan.

The Debtor may propose amendments or modifications to its Plan at any time prior to the date of the entry of the Order Confirming Plan, with leave of the Court, and upon proper notice to parties in interest. After the date of the Order Confirming Plan, Debtor may, with approval of the Court so long as it does not materially or adversely affect the interests of creditors, remedy any defects or omissions or reconcile any inconsistencies in the Plan or in the Order Confirming Plan in such manner as may be necessary to carry out the purpose and effect of this Plan.

B.      Effect of Confirmation of the Plan.

The provisions of the Plan once confirmed are binding upon the Debtor and all creditors. The confirmation of the Plan vests all property of the estate in the Debtor except as otherwise provided in the Plan. The Debtor's property is free and clear of all claims and interests except as otherwise provided in the Plan. The confirmation will create an injunction as to any debt which arose prior to confirmation, whether maker or guarantor, and, except as provided for in the Plan, Order Confirming Plan or the Bankruptcy Code upon completing the terms and payments of the Plan of Reorganization, those debts and claims will be permanently protected from collection. Upon the Debtor successfully completing the terms of a confirmed Chapter 11 Plan of Reorganization, the Debtor will have no further liability to any creditor of the Debtor, including the Internal Revenue Service, for any and all debts and liabilities included herein.

C.      Executory Contracts.

All executory contracts of the Debtor not expressly rejected in writing on or before the date of the hearing on Confirmation of the Plan shall be deemed assumed. The Debtor has no cure obligations, for all leases are current. Rejection is accomplished by filing a notice thereof with the Court, together with a proof of service of said notice of the Application to reject upon all parties affected thereby.

D.      Default

Upon default by the either of the Reorganized Debtor, creditors (other than the Internal Revenue Service) are required to provide written notice of such Default to the Reorganized Debtor Gary Joel Katleman and his counsel, R. Glen Ayers of Langley & Banack, Inc., by certified mail, return receipt requested, and by regular first class mail, and the Reorganized Debtor shall have thirty (30) days from the date of the notice to cure the default. Any defect in such default notice shall toll the running of the thirty (30) day cure period. Notice shall also be given to the Reorganized Debtor, Joel M. Katleman, and his counsel, William B. Kingman. If the defaulting Reorganized Debtor(s) fail(s) to cure within the thirty (30) day cure period provided herein, secured creditors shall be allowed to foreclose their liens without further notice of hearing before the Court.

The United States (Internal Revenue Service) requests the following default language:

(a)    that the debt owed by the either Debtor to the IRS is a nondischargeable debt, except as otherwise provided for in the Bankruptcy Code, and that if the Debtor should default, the IRS is not subject to the provisions of the Bankruptcy Code so that the IRS can take whatever actions are necessary to collect said debt in the event of default; and

(b)    a failure by either of the Debtors to make a payment to the IRS pursuant to the terms of the Plan shall be an event of default; as to the IRS, there is an event of default if payment is not received by the 15th day of each month; if there is a default to IRS, IRS must send written demand for payment to the Debtor and said payment must be received by the IRS within fifteen (15) days of the date of the demand letter; the Debtor can receive up to five (5) notices of default from the IRS; however, on the fifth default cannot be cured, and the IRS may accelerate its allowed claim(s), past or future, and declare the outstanding amount of such claim(s) to be immediately due and owing, and pursue any and all available state and federal rights and remedies.

(c)    The IRS is bound by the provisions of the confirmed Plan and is barred under Section 1141 from taking any collection action against the Debtors for pre-petition claims during the duration of the Plan (provided there is no default as to the IRS). The period of limitations on collection remains suspended under 26 U.S.C. Sec. 6503(h) for tax periods being paid under the Plan and terminates on the earlier of (1) all required payments to the IRS has been made; or (2) 30 days after the date of a demand letter for which the Debtor failed to cure the default.

## XV.    **CONCLUSION**

The Debtors submit this Disclosure Statement and the information contained herein in good faith; in accordance with the provisions of 11 UCC Section 101, *et. seq.*, the Disclosure Statement and information contained therein are submitted for consideration by creditors and other parties in interest, and as the sole source of information furnished by the Debtors, or to be furnished by the Debtors, in solicitation of acceptance of Debtors' Plan of Reorganization.

The Debtors recommends that the Plan of Reorganization be approved in light of the alternative of an orderly liquidation, which would provide a significant payment only to the largest unsecured creditors, Falcon Bank and EF Funding.

Secured Creditors. An operating plan as proposed herein leads the Debtor to conclude that the Plan is in the best interest of all creditors and parties-in-interest; therefore, all Creditors and Interest Holders alike should vote to accept the Plan.

[intentionally left blank]

## ARTICLE XV.

## ATTACHMENTS AND EXHIBITS

Exhibit "A"    Monthly Operating Reports
Exhibit "B"    Schedule of Future Payments and Sources of Funds
Exhibit "C"    Schedule B, Personal Property, Debtor's Schedules
Exhibit "D"    Schedule G, Executory Contracts and Unexpired Leases
Exhibit "E"    Liquidation Analysis
Exhibit "F"    Proposed Plan of Reorganization

DATED:  March _2/_, 2010.

_____
GARY JOEL KATLEMAN

OF COUNSEL:


BY:_____
R. GLEN AYERS
State Bar No. 01467500
LANGLEY & BANACK, INC.
745 E. Mulberry, Suite 900
San Antonio, Texas 78212
Telephone:  (210) 736-6600


_____
JOEL M. KATLEMAN


OF COUNSEL:
WILLIAM B. KINGMAN
State Bar No. _11476200_
4040 Broadway, Suite _____
San Antonio, Texas 78212

## ARTICLE XV.

## ATTACHMENTS AND EXHIBITS

| | |
|---|---|
| Exhibit "A" | Monthly Operating Reports |
| Exhibit "B" | Schedule of Future Payments and Sources of Funds |
| Exhibit ʌC" | Schedule B, Personal Property, Debtor=s Schedules |
| Exhibit "D" | Schedule G, Executory Contracts and Unexpired Leases |
| Exhibit ʌE" | Liquidation Analysis |
| Exhibit ʌF" | Proposed Plan of Reorganization |

DATED: March 21, 2010.

GARY JOEL KATLEMAN

OF COUNSEL:

BY:_____
     R. GLEN AYERS
     State Bar No. 01467500
     LANGLEY & BANACK, INC.
     745 E. Mulberry, Suite 900
     San Antonio, Texas 78212
     Telephone: (210) 736-6600

JOEL M. KATLEMAN

OF COUNSEL:
WILLIAM B. KINGMAN
State Bar No. _____
4040 Broadway, Suite _____
San Antonio, Texas 78212